Filed 7/27/23 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| RIDEC LLC, <br><br> Defendant, Cross-complainant and Appellant, <br><br> v. <br><br> OCY HINKLE et al., <br><br> Defendants, Cross-defendants and Respondents. | B317420 <br><br> (Los Angeles County Super. Ct. No. BC560228) <br><br> ORDER MODIFYING OPINION AND DENYING REHEARING <br><br> NO CHANGE IN THE JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on June 29, 2023, be
modified as follows:

1. At the end of the first paragraph on page 29, after the
   sentence which ends with "to second-guess such a
   finding" in line 9, insert footnote 15 as follows:

Ocy filed a petition for rehearing in which he disputes our analysis on some of these points. Ocy's petition is procedurally improper. Ocy elected not to file a respondent's brief and not to participate in oral argument. In such instances, we may—and in this case, did—decide the appeal without his involvement. (Cal. Rules of Court, rule 8.220(a)(2).) Ocy now appears on rehearing requesting that we vacate the opinion so he can file a respondent's brief; this request is not well taken. We decline to permit rehearing to be used as a "reset button" for litigants who, in hindsight, regret their decision not to participate in the appellate process. What is more, Ocy's petition on the merits does nothing more than express disagreement with our analysis without adding any new authority or citation to the record. Thus, it is both procedurally improper *and* without merit.

\* \* \*

There is no change in the judgment.

Respondent Ocy Hinkle's petition for rehearing is denied.

_____

LUI, P. J.              CHAVEZ, J.              HOFFSTADT, J.

2

Filed 6/29/23 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| RIDEC LLC, | B317420 |
| Defendant, Cross-complainant and Appellant, | (Los Angeles County Super. Ct. No. BC560228) |
| v. | |
| OCY HINKLE et al., | |
| Defendants, Cross-defendants and Respondents. | |


APPEALS from a judgment and order of the Superior Court of Los Angeles County, Barbara Ann Meiers, Judge. Reversed and remanded with directions.

Steyer Lowenthal Boodrookas Alvarez & Smith, Carlos A. Alvarez and Jill K. Cohoe for Defendant, Cross-complainant and Appellant.

No appearance for Defendants, Cross-defendants and Respondents.

\* \* \* \* \* \*

In *Tsasu LLC v. U.S. Bank Trust, N.A.* (2021) 62 Cal.App.5th 704 (*Tsasu*), this court construed one section of California's Quiet Title Act (the Act) (Code Civ. Proc., § 760.010 et seq.).[1] Specifically, *Tsasu* confirmed that section 764.060 provides that a party acquiring title to property "in reliance" on a quiet title judgment retains its rights in that property—even if that judgment is subsequently invalidated as void—as long as the party is a "purchaser or encumbrancer for value" who lacked "knowledge of any defects or irregularities in [the earlier quiet title] judgment or the proceedings." (§ 764.060; *Tsasu*, at p. 710.) Here, the trial court declined to follow the plain text of section 764.060 and *Tsasu*, and instead followed the pre-Act, common law rule that deems invalid any and all rights deriving from a judgment later invalidated as void. These appeals present three questions: Was the trial court's refusal to apply binding statutory and decisional law warranted by the court's views that (1) the common law rule better accorded with the trial court's public policy preferences, (2) the common law rule applicable to non-quiet title actions cannot coexist with the Act's rule for quiet title judgments, or (3) section 764.060 is unconstitutional? The answer to all questions is "no." A trial court may not disregard the plain text of a statute or binding precedent in favor of its own view of what the law should be, and section 764.060 does not violate due process or deny equal protection of the law. Because

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

the trial court also erred when, in the alternative, it applied section 764.060 to deprive a lender of its rights to property based on a later-invalidated quiet title judgment, we reverse the trial court's judgment and order that judgment be entered for the lender.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

### A. *Ocie Payne Hinkle suffers elder abuse when her acquaintance deeds her property to others*

In 2010, Ocie Payne Hinkle (Ocie)[2] was an 89-year-old woman who owned several parcels of property in Los Angeles, California. Ocie has an adult son, Ocy.

A few years earlier, Ocie had started a relationship with Roi Wilson (Wilson). In the fall of 2010, Ocie was hospitalized and medicated; while in that state, Wilson prevailed upon Ocie to grant him power of attorney over her affairs.

Wilson then used that power of attorney to deed away much of Ocie's real property. As pertinent to this case, while acting as Ocie's "attorney-in-fact," Wilson, on October 22, 2010, signed a grant deed giving Ocie's property at 1723 Buckingham Road (the Buckingham property or the property) to Edmound Daire (Daire) (the October 2010 grant deed). Integral to his frauds, Daire is a professional "document preparer."

In January 2011, after Ocy learned of Wilson's conduct against his mother, Ocie was placed in a conservatorship.

---

[2] Because some of the parties have the same last name, we will use first names for clarity's sake. We mean no disrespect.

3

**B.    *Ocy's claim to the Buckingham property***

On November 10, 2010, Daire signed a grant deed giving the property back to Ocie (the November 2010 grant deed).[3]

After Ocie passed away in May 2014, Ocy became the administrator of her estate, and, as her sole heir, entitled to title to the Buckingham property.

**C.    *Daire's claim to the Buckingham property***

1.    *Daire obtains a quiet title judgment*

On October 8, 2014, Daire filed a verified complaint to quiet title to the Buckingham property in his name.  As defendants, and as pertinent to this case, he named (1) Ocie, (2) Wilson, and (3) "All Persons Unknown Claiming Any Legal or Equitable Right, Title, Estate, Lien, or Interest in the Property Described in the Complaint Adverse to Plaintiff's Title or Any Cloud on Plaintiff's Title Thereto."  In his complaint, Daire alleged that he had title pursuant to the October 2010 grant deed and that the subsequent November 2010 grant deed purporting to reverse the transfer was a forgery; thus, he sought to cancel the November 2010 grant deed and quiet title to the Buckingham property in himself.  On January 23, 2015, Daire recorded a lis pendens regarding his pending quiet title lawsuit.  According to a proof of service later filed with the court, Daire's process server personally served Ocie with the complaint on March 28, 2015.

On June 11, 2015, Daire requested—and the court clerk entered—a default against Ocie.

---

[3]    Around the same time, Wilson used the power of attorney to purport to deed the Buckingham property and six other parcels owned by Ocie to Julie Goddard (Goddard).  All of those transfers were later reversed by the probate court in January 2012.

On November 6, 2015, the trial court held a hearing on whether to enter judgment against Ocie in Daire's quiet title action. At that hearing, the court heard evidence (chiefly, Daire's testimony) and took judicial notice of the record chain of title. At the conclusion of the hearing, the court entered judgment quieting title to the Buckingham property in Daire and expunging the November 2010 grant deed.[4] In its judgment, the court also found that Ocie had been "regularly served with lawful process, via personal service."

Daire recorded the quiet title judgment in the County Recorder's Office a week later, on November 13, 2015.

2. *On the basis of the quiet title judgment, Daire obtains two loans using the Buckingham property as collateral*

Within a few months of recording the quiet title judgment in his favor, Daire applied for two loans.

a. The Ridec loan

Around December 2015, Daire applied to Ridec LLC (Ridec) for a $650,000 loan and offered up the Buckingham property as collateral. Ridec retained a title insurer. The title insurer ran a title report on the Buckingham property on December 29, 2015; that report reflected the following:

- The October 2010 grant deed;

---

4       Interestingly, Daire tried the same maneuver on a different property owned by Ocie and deeded to Daire by Wilson. When Daire sought to quiet title in that other property, however, the trial court (with a different judge presiding in that separate case) found Daire not to be "credible" at the evidentiary hearing and rejected his claim to quiet title. To evade that unfavorable ruling, Daire filed another quiet title action as to that other property, and prevailed in obtaining a default quiet title judgment; that judgment was later vacated.

5

- The November 2010 grant deed;
- A February 3, 2011, notice of the conservatorship action over Ocie, which specified that the action "may affect" the Buckingham property; and
- The 2015 judgment quieting title to the Buckingham property in Daire and the order expunging the November 2010 grant deed.

Because the time to appeal the November 6, 2015, quiet title judgment did not expire for 180 days (that is, until early May 2016), Ridec's title insurer insisted that Ridec wait for the end of that appeal period to ensure that there were no appellate challenges to that judgment. On May 13, 2016, the title insurer ran a second title report on the Buckingham property, which reflected the following additional information:

- A notice of lis pendens, recorded on February 25, 2016, reflecting the commencement of the probate of Ocie's estate, which specified that it "affect[ed] title" to the Buckingham property (the February 2016 lis pendens); and
- A notice of withdrawal of the February 2016 lis pendens, recorded on April 25, 2016 (the April 2016 notice of withdrawal).

In light of the expiration of the time to appeal the quiet title judgment, the withdrawal of the lis pendens filed during that appeal period, and the absence of any other reason to question the validity of Daire's title, the title insurer informed Ridec that title to the Buckingham property was vested in Daire; thus, on May 16, 2016, escrow on the loan closed, Ridec recorded a deed of trust on the Buckingham property for $650,000, and Ridec wired $568,711.35 to Daire's account at Citibank, N.A. (Citibank).

6

####### b.    The PSG Capital Partners, Inc. (PSG) loan

Daire also borrowed $400,000 from PSG, which was also secured by a deed of trust on the Buckingham property. Daire falsely told PSG that PSG had the "first" deed of trust on the property, as Ridec had recorded its deed of trust against the Buckingham property one day earlier. After recording its deed of trust on June 17, 2016, PSG subsequently transferred it to Fortunato Capital Partners, LLC, who then transferred it to Title Resources Guaranty Company (Title Resources).

####### 3.    *The trial court subsequently sets aside the quiet title judgment*

On May 20, 2016, just days after escrow closed on the Ridec loan, Ridec's title insurer sent a letter and small escrow refund check to Daire at the Buckingham property, but Ocy was living there at the time. This alerted Ocy to Daire's fraud, and Ocy's lawyer immediately sent a letter to the title insurer.

Upon further investigation, Ocy learned that (1) Daire had filed a fraudulent proof of service in conjunction with his quiet title action, which reported that Ocie had been personally served with Daire's complaint on March 28, 2015, although she had died nearly a year before (on May 9, 2014); and (2) Daire had filed a fraudulent notice of withdrawal of the February 2016 lis pendens in April 2016, on which he had forged the signature of Ocy's lawyer.

For whatever reason, Ocy (acting as administrator of Ocie's estate) waited a year, until June 15, 2017, to file a motion to vacate the quiet title judgment on the ground that neither Ocie nor her estate were ever served in the quiet title action.

7

On August 2, 2017, the trial court granted Ocy's motion and set aside the quiet title judgment.

## II. Procedural Background

### A. *The various complaints*

Once Daire's deceptions came to light, the litigation frenzy began. On May 31, 2016, Ridec's title insurer sued Daire and Citibank, seeking—and obtaining—court orders freezing the disbursed loan funds still in Daire's Citibank account. Ridec joined that lawsuit via a cross-complaint against Daire, Ocy, and PSG, in which it sought to establish the validity of its deed of trust. On June 1, 2016, Daire sued Citibank. Ridec also joined that lawsuit via a cross-complaint. Ridec then filed a "complaint in intervention" in Daire's underlying quiet title action (which was reactivated when Ocie's estate filed the motion to vacate the judgment in that action). The trial court subsequently consolidated these actions.[5]

### B. *Litigation*

The trial court litigated the consolidated case in two phases relevant to these appeals.[6]

#### 1. *The first phase*

The first phase was meant to answer the question: As between Daire and Ocy (in his capacity as administrator of Ocie's

---

[5] The consolidation order also folded in Daire's lawsuit involving Ocie's other property in which Daire had fraudulently quieted title in himself.

[6] The trial court also had planned for a third phase— regarding whether the two defrauded lenders could obtain punitive damages against Daire. The court ultimately determined that they could not, but that ruling is not challenged on appeal.

8

estate), who has title to the Buckingham property?[7]  After a one-day bench trial in November 2018, the trial court issued a January 2019 order quieting title to the Buckingham property in Ocy and declaring that Daire had no valid interest in the property.

### 2. *The second phase*

The second phase was meant to answer the question:  As between Ridec and PSG (collectively, the lenders) and Ocy (again, in his capacity as administrator of Ocie's estate), were the lenders' deeds of trust valid encumbrances on the Buckingham property?[8]

The court held a three-day bench trial in April 2021.  On the very first day of trial and in closing arguments, the parties brought *Tsasu* (which was decided on April 1, 2021) to the trial court's attention.

### a. The tentative rulings

The trial court issued a tentative ruling in June 2021, invited further briefing in which the parties again discussed *Tsasu*, and then issued a further tentative ruling in August 2021. Together, these 35 pages of tentative rulings conclude that the lenders' deeds of trust are invalid and do not encumber Ocy's title to the Buckingham property.[9]

---

[7]    The pleading at issue in this first phase was Daire's complaint in the quiet title action.

[8]    The pleadings at issue in this second phase were Ridec's and PSG's cross-complaints filed in the title company's lawsuit; the lenders abandoned the remainder of their complaints.

[9]    However, the trial court did conclude that the lenders are entitled to recover the amounts of their loans, plus interest,

9

In coming to this conclusion, the trial court acknowledged the Act—and section 764.060, specifically—"stand for the . . . proposition . . . that even if a quiet title judgment is completely void due to a failure to give notice to the owner, a [bona fide encumbrancer who makes a loan in reliance on that judgment] will be entitled to prevail." The court also acknowledged that two appellate decisions—specifically, *OC Interior Services, LLC v. Nationstar Mortgage, LLC* (2017) 7 Cal.App.5th 1318 (*OC Interior*) and *Deutsche Bank Nat. Trust Co. v. Pyle* (2017) 13 Cal.App.5th 513 (*Deutsche Bank*)—had, in dicta, suggested that the very same proposition was correct.

But the trial court rejected that proposition. In the trial court's view, it was preferable to use the pre-Act, common law rule, which provided that any rights in property deriving from a void judgment were invalid, even if the party acquiring those rights had acted in good faith and without knowledge of any defect in the judgment.[10] The trial court cited what boils down to three reasons for favoring the common law rule over the Act.

_____

against Daire, and the lenders stipulated as to how to divide between them the interpleaded funds Citibank deposited with the court from Daire's account.

[10] The court also devoted some of its ruling to explaining *when* a party may challenge a judgment as being void—namely, when the judgment is "void on its face," which the court defined as being true when the judgment's voidness is apparent from the "judgment roll," which the court further defined as including "all of the public courthouse records relating to the parties and/or property." The trial court's explication of this aspect of the common law rule is both irrelevant and incorrect. It is irrelevant because the issue before the court in the second phase of the proceedings was not *when* a party may challenge a judgment as

First, the court reasoned that applying the common law rule to quiet title judgments is better public policy:  The common law rule tends to favor the original owners of property over subsequent lenders (since the lenders will usually be the ones to base their rights on earlier quiet title judgments), and the court reasoned that this outcome was a better one because (a) it is easier for lenders to run retrospective title searches when they make loans than it is for owners to periodically run title searches after they have acquired the property, (b) equity favors having the lenders lose because lenders know that buying property at foreclosure auctions is a "high risk investment[,]" (c) lenders are in a "far better position" to absorb losses because they have title insurance, and (d) the amount of loss lenders face will likely be small in the grand scheme of things because void judgments are "few" in number.

Second, the court reasoned that applying the Act to quiet title judgments while applying the common law rule to other

---

void, but the *effect* of such a successful challenge on the rights of parties who relied on that now-invalid judgment.  It is incorrect because (1) whether a judgment is void on its face determines whether it may be attacked *collaterally* (as a judgment may be *directly* attacked even if it is not void on its face) (*OC Interior*, *supra*, 7 Cal.App.5th at pp. 1327-1331; *Kremerman v. White* (2021) 71 Cal.App.5th 358, 370 (*Kremerman*)); and (2) the trial court's expansive definition of what constitutes the "judgment roll" is flatly inconsistent with the governing statutory and decisional law (§ 670 [where an answer is not filed, the "judgment roll" consists only of the complaint, summons, affidavit or proof of service, the request for entry of default, and a copy of the judgment]; *OC Interior*, at pp. 1327-1328 [no "extrinsic evidence" beyond this "record" of the proceedings identified in section 670 is part of the "judgment roll"]).

11

judgments (such as those based on cancellation of instruments) means that "incompatible and irreconcilable standards" will be applied to nearly identical claims based solely on the "label" attached to those claims.

Third, the court reasoned that applying the Act violates due process because the Act sometimes enforces rights pursuant to judgments that were themselves obtained in violation of due process.

Applying the common law rule, the court found that the quiet title judgment was void due to the lack of valid service on Ocie or her estate, such that Ridec and PSG's deeds of trust—which were derived from that void judgment—were invalid.

### b. The final ruling

After Ridec filed a request for a statement of decision enumerating 13 specific issues, the trial court issued a five-page supplemental and final order. In that order, the court reaffirmed its tentative rulings that it would apply the common law rule instead of the Act, and proclaimed that its rulings were not "inconsistent" with *Tsasu* but offered no explanation for its proclamation. The court also offered a new, alternative rationale for ruling in Ocy's favor: Even if the Act applied, Ridec did not qualify as an "encumbrancer without notice" of defects in the quiet title judgment under Code of Civil Procedure section 764.060 because Ridec had "constructive knowledge and as to some matters 'actual knowledge' of facts which Ridec chose to disregard." The court alluded to a "great deal" of examples of Ridec's knowledge, but chose only to articulate a "small[er] part" of those examples—namely, (1) Ocy testified that he saw "picture takers . . . at the property" in early 2016 who said "they were there in connection with" a "lender's" "investigation," and that

12

Ocy told them "they were being defrauded"; (2) the April 2016 notice of withdrawal was "most suspicious," yet Ridec did not make a "reasonable inquiry" by calling the attorney who signed that withdrawal; and (3) Ridec did not conduct a physical inspection of the property, which the court implied was required by Civil Code section 2079.5.

## C.    *Judgment and appeals*

Ridec timely appealed the judgment and the denial of its posttrial motion to set aside that judgment.[11]

## DISCUSSION

Ridec challenges the trial court's ruling declaring its deed of trust invalid.

## I.    Pertinent Law

Enacted in 1980, the Act creates a special mechanism for obtaining quiet title judgments that operate in rem—and hence are binding not only against the parties to the quiet title proceeding, but also "'against all the world.'" (*Nickell v. Matlock* (2012) 206 Cal.App.4th 934, 944 (*Nickell*); *Tsasu, supra*, 62 Cal.App.5th at p. 715.) Indeed, our Legislature's chief aim in adopting the Act was to empower courts to issue in rem decrees because in rem decrees have greater permanence compared to the in personam decrees that bind only the parties to the lawsuit; in rem decrees accordingly "enhance the marketability of property as to which a[] . . . quiet title decree has been rendered." (Assem.

---

[11]    PSG did not appeal, so we have no jurisdiction to modify the trial court's judgment vis-à-vis PSG.

Although Ridec served its opening brief on Ocy's attorney (who represents Ocy in his individual capacity and in his capacity as administrator of Ocie's estate), Ocie elected not to file a Respondent's Brief in either capacity.

Com. on Judiciary, Analysis of Assem. Bill No. 1676 (1979-1980 Reg. Sess.) Jan. 16, 1980, pp. 1-2; Cal. Law Revision Com., Analysis of Assem. Bill 1676 (1979-1980 Reg. Sess.) Feb. 21, 1980, p. 1; Recommendation Relating to Quiet Title Actions (Sept. 1979) 15 Cal. Law Revision Com. Rep. (1980) pp. 1207-1208.)

Mindful of the need to provide due process protections for those persons who would be bound by the in rem quiet title judgment even though they did not participate in the litigation producing it, the Act's "requirements for obtaining a[n in rem] quiet title judgment . . . are more stringent than the requirements for obtaining judgments resolving adverse claims to property under other [in personam] causes of action." (*Tsasu*, *supra*, 62 Cal.App.5th at pp. 715-716.) To obtain a quiet title judgment under the Act, the plaintiff must (1) file a verified complaint that names, as defendants, (a) "[all] persons having adverse claims" to the plaintiff's title, and that includes persons whose claims are "of record," whose claims are "known to the plaintiff," or whose claims are "reasonably apparent from an inspection of the property," and (b) "'all persons unknown, claiming any legal or equitable right, title, estate, lien, or interest in the property described in the complaint adverse to plaintiff's title, or any cloud upon plaintiff's title thereto'" (§§ 762.060, subds. (a) & (b), 761.020); (2) record a lis pendens regarding the pendency of the quiet title action in the county recorder's office where the property is located (§ 761.010, subd. (b)); and (3) establish entitlement to a quiet title judgment with "evidence of [the] plaintiff's title" rather than "by default" (§ 764.010), although the courts are split as to whether this requires an evidentiary hearing at which a defaulted defendant may participate (*Nickell*, *supra*, 206 Cal.App.4th at p. 947; *Harbour*

14

*Vista, LLC v. HSBC Mortgage Services Inc.* (2011) 201
Cal.App.4th 1496, 1502-1504, 1507 (*Harbour Vista*)) or merely a
prove-up hearing at which a higher quantum of evidence must be
produced (*Yeung v. Soos* (2004) 119 Cal.App.4th 576, 580-581
(*Yeung*)). (See generally *Tsasu*, at p. 716; *Deutsche Bank*, *supra*,
13 Cal.App.5th at pp. 523-525.)

Once the Act's more stringent requirements are met, the
resulting quiet title judgment is "more resilient to subsequent
challenges." (*Tsasu*, *supra*, 62 Cal.App.5th at p. 716.)

As to persons who had "claim[s]" to the property at issue in
the quiet title judgment at the time that judgment was rendered,
the resilience of that judgment to subsequent attack turns on
whether those persons were a party to the quiet title action: If a
person seeking to attack the quiet title judgment was a party to
the quiet title action, the quiet title judgment is "binding and
conclusive" (§ 764.030, subd. (a)); if the person seeking to attack
the quiet title judgment was *not* a party to the quiet title action,
then the quiet title judgment is "binding and conclusive" unless
(1) "at the time the lis pendens [for the action] was filed or, if
none was filed, at the time the [quiet title] judgment was
recorded," the nonparty's claim was "of record" (§§764.045, subd.
(a), 764.030, subd. (b)); or (2) the nonparty's claim was "actually
known to the plaintiff or would have been reasonably apparent
from an inspection of the property" (§ 764.045, subd. (b)).[12]

_____

**12** Ocy, acting as administrator of his mother's estate,
effectively took advantage of this basis for challenging the quiet
title judgment: Ocie's estate had a claim to the Buckingham
property at the time of the quiet title judgment; Ocie's estate was
not a party to that action due to the absence of any service; and
Ocie's estate's claim was "of record." As a result, the judgment
was not "binding and conclusive" as to Ocy.

As to persons who did not have claims in the property at the time of the quiet title judgment and who instead "reli[ed] on the [quiet title] judgment" when subsequently acquiring rights in the property, those persons shall retain those "rights" in the property pursuant to Code of Civil Procedure section 764.060— even if the quiet title judgment is later invalidated "based on lack of actual notice to a party or otherwise"—as long as that person was a "purchaser or encumbrancer for value . . . without knowledge of any defects or irregularities in the [quiet title] judgment or the proceedings." (Code Civ. Proc., § 764.060.) In *Tsasu*, we held that "without knowledge" of any defects or irregularities means without any "actual or constructive knowledge" of them. (*Tsasu*, *supra*, 62 Cal.App.5th at p. 710.) For these purposes, "'actual' knowledge exists when a person is [actually,] subjectively aware of a fact," while "'constructive' knowledge exists when a person is deemed in the eyes of the law to be aware of a fact, either because (1) the person has ""knowledge of circumstances which, upon reasonable inquiry, would lead to that particular fact [citations]"""; or (2) the fact is contained in a document that has been ""recorded as prescribed by law."" (*Id.* at p. 719.) A person obtains constructive knowledge through recorded documents only if those documents have been properly indexed in the "chain of title" for the property at issue (*Stearns v. Title Ins. & Trust Co.* (1971) 18 Cal.App.3d 162, 169; *Far West Savings & Loan Assn. v. McLaughlin* (1988) 201 Cal.App.3d 67, 73; *Diel v. Security Title Ins. Co.* (1956) 142 Cal.App.2d 808, 810; Civ. Code, § 1170); thus, the trial court's suggestion that constructive knowledge is imputed as to "all of the public courthouse records relating to the parties and/or property" is incorrect. What is more, the two branches of

16

constructive knowledge interact: If a properly recorded document refers to further recorded documents, the person has constructive knowledge of what a reasonable inquiry into those further documents would reveal. (*Triple A Management Co. v. Frisone* (1999) 69 Cal.App.4th 520, 532-533.)

## II. Analysis

When examining a trial court's ruling that rights in property are valid or invalid under the Act in any particular case, our standard of review turns on whether the facts were disputed. To the extent the facts were undisputed, and the trial court merely applied the undisputed facts to the law, our review is de novo. (*Tsasu, supra*, 62 Cal.App.5th at p. 715; *Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1183; *Martinez v. Brownco Construction Co.* (2013) 56 Cal.4th 1014, 1018.) To the extent the facts were disputed, we review the trial court's factual findings for substantial evidence. (*People v. Sledge* (2017) 7 Cal.App.5th 1089, 1095-1096; *Thorstrom v. Thorstrom* (2011) 196 Cal.App.4th 1406, 1417.) And where, as here, the party asserting error on appeal had the burden of proof below, we may reverse only if the record compels a finding in that party's favor as a matter of law. (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838.)

We conclude that the trial court erred when it invalidated Ridec's deed of trust in the Buckingham property and thereby impaired Ridec's rights in that property.

Because Ridec acquired its rights in that property *after* the quiet title judgment, and did so "in reliance on th[at] judgment," section 764.060 supplies the pertinent rule. Under section 764.060, Ridec's rights in the property may not be impaired as

17

long as Ridec (1) was "a purchaser or encumbrancer for value," and (2) "act[ed] . . . without knowledge of any defects or irregularities in the judgment or the proceedings." (§ 764.060.)

It is undisputed that Ridec was an encumbrancer for value because its deed of trust was in exchange for loaning Daire $650,000.

The record also compels a finding, as a matter of law, that Ridec acted "without knowledge of any defects or irregularities" in the quiet title judgment or the proceedings that produced it. There is no evidence that Ridec (and, necessarily, its officers or employees) had any actual, subjective knowledge regarding the two chief defects with the quiet title judgment or the validity of Daire's title at the time of its loan—namely, that (1) despite Daire's service of process form purporting to have served Ocie, Ocie was dead at the time Daire filed the quiet title action and, as a result, Ocie's estate was neither named nor served; and (2) Ocy's lawyer had *not* signed the 2016 notice of withdrawal. Ridec also had no constructive knowledge of these defects or any invalidity of Daire's title. The quiet title judgment appeared to be in compliance with the Act: That proceeding was initiated by a verified complaint that named Ocie, Wilson, and the others with a claim to the property[13] as well as "All Persons Unknown Claiming Any Legal or Equitable Right, Title, Estate, Lien, or

_____

[13]    Although the title report listed that Ocie had also deeded the Buckingham property to Goddard in December 2010, that report also indicated that the conservatorship action was initiated in 2011, which led to a January 2012 court order invalidating the transfer to Goddard; as a result, Ridec's investigation of the title report entries showed that Goddard no longer had a claim to the Buckingham property at the time Daire filed the quiet title action in 2014.

18

Interest in the Property . . ."; Daire recorded a lis pendens regarding the action; the proof of service on Ocie appeared valid on its face; and the trial court entered the quiet title judgment only after conducting an evidentiary hearing, and in that judgment found that Daire's service on Ocie was valid and that Daire had established his entitlement to quiet title. What is more, nothing in the chain of title otherwise called the validity of the quiet title judgment into question: The 2011 lis pendens predated the quiet title judgment and involved Ocie, whom the record showed to be a party to the subsequent quiet title proceeding and hence bound by it; and the February 2016 lis pendens was subsequently withdrawn by the April 2016 notice of withdrawal, thereby eliminating any cloud on the title. Although the February 2016 lis pendens related to the probate action of Ocie's estate, that fact would not impute knowledge to Ridec that Ocie had been dead (and therefore could not have been served) at the time of Daire's *2015* quiet title judgment.

Thus, under section 764.060, as construed in *Tsasu*, Ridec was an encumbrancer for value who acted without knowledge of any defects or irregularities with the quiet title judgment; as a result, its "rights" could not be "impair[ed]" and its deed of trust remained valid.

## III. The Trial Court's Contrary Analysis

The trial court invalidated Ridec's claim to the Buckingham property for essentially two categories of reasons. First, the court reasoned that section 764.060 and *Tsasu* did not apply. Second, and alternatively, the court reasoned that, even if they did, Ridec's rights could be impaired because Ridec had actual and constructive knowledge of defects with the quiet title judgment.

### A. *Refusal to apply section 764.060 and* Tsasu

Although the trial court, at the outset of the first of its two tentative rulings, readily acknowledged that the Act—and section 764.060 in particular—"st[ood] for the proposition" that Ridec was "entitled to prevail," the court refused to apply section 764.060. And although the court was repeatedly pointed to *Tsasu* and even given a copy of *Tsasu*, the court, in its 35 pages of tentative rulings, never cited or applied *Tsasu* and, going a step further, affirmatively disclaimed the *very existence* of *Tsasu* when the court stated that "no Second District case . . . has discussed the[] holdings [of *OC Interior* and *Deutsche Bank*] in connection with the matters now in issue, much less distinguished them or declined to follow them"—even though that is precisely what *Tsasu* did. To be sure, the court in its final ruling proclaimed in one sentence that its ruling was not "inconsistent" with *Tsasu*, but the court made no effort to explain how its decision rejecting the Act was "[]consistent" with the *Tsasu* decision applying the Act.

Thus, the question we confront is: Was the trial court justified in ignoring the plain text of section 764.060 or in disregarding binding precedent when it declined to apply that section and the *Tsasu* decision interpreting it, and instead chose to apply the pre-Act, common law rule? This question turns on questions of statutory and constitutional interpretation, which are questions of law subject to de novo review. (*Weatherford v. City of San Rafael* (2017) 2 Cal.5th 1241, 1247 [statutory interpretation]; *People v. Cromer* (2001) 24 Cal.4th 889, 894 [constitutional interpretation].)

The trial court offered three potential justifications. We examine each.

20

First, the trial court detailed why, in its view, public policy is better served by applying the common law rule, which invalidates rights in real property that derive from any judgment (including a quiet title judgment) later determined to be void (*Marlenee v. Brown* (1943) 21 Cal.2d 668, 677; *Hunt v. Loucks* (1869) 38 Cal. 372, 376; *Gray v. Hawes* (1857) 8 Cal. 562, 568; cf. *Newport v. Hatton* (1929) 207 Cal. 515, 519), rather than section 764.060, which allows persons who purchase or encumber property in reliance on a subsequently voided quiet title judgment to retain their rights as long as they do not have any actual or constructive knowledge of defects with that judgment. This reasoning steps outside the lines of proper judicial analysis. Determining what best serves public policy is the job of our Legislature, not individual judges. This is especially true where, as here, the Legislature has already come to a different public policy determination on *precisely* the same issue—that is, that a person *shall* retain its rights in property that derive from a quiet title judgment, even if that judgment is declared void "based on [a] lack of actual notice to a party" to that judgment. (§ 764.060) By effectively rewriting section 764.060, the trial court not only transgressed the fundamental maxim that courts may not "rewrite statutes" (*State Dept. of Public Health v. Superior Court* (2015) 60 Cal.4th 940, 956), but also anointed itself a super-legislature imbued with the power to second-guess the public policy determinations of our Legislature. The trial court suggested that its otherwise impermissible act of judicial policymaking was authorized by the Act because section 760.040 provides that "[n]othing in this chapter limits any authority the court may have to grant such equitable relief as may be proper under the circumstances of the case." (§ 760.040, subd. (c).) But

this provision serves a far more modest function: It authorizes courts to issue supplemental, equitable relief when implementing the Act (e.g., *Vanderkous v. Conley* (2010) 188 Cal.App.4th 111, 119 [this provision authorizes trial courts to issue ancillary relief "'to do complete justice'"]); nothing in section 760.040 empowers courts to ignore the plain text of other sections of the Act in the name of "equity" and public policy. (Accord, *Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 805 ["'A court must, where reasonably possible, harmonize statutes, reconcile seeming inconsistencies in them, and construe them to give force and effect to all of their provisions'"]; *Horwich v. Superior Court* (1999) 21 Cal.4th 272, 276 [courts must read statutes ""'with reference to the entire scheme of law of which [they are a] part so that the whole may be harmonized and retain effectiveness"'"]; *Williams v. Superior Court* (1993) 5 Cal.4th 337, 357 ["An interpretation that renders statutory language a nullity is obviously to be avoided"].)

Second, the trial court reasoned that applying the Act's provisions to give effect to rights in property derived from void quiet title judgments—while continuing to apply the contrary common law rule to judgments resting on claims *other than* quiet title—results in "incompatible and irreconcilable standards" based merely on the label of the claim and which will lead to gameplaying by litigants. As a threshold matter, this reason does little more than impermissibly second-guess the Legislature's wisdom of erecting a separate rule for quiet title judgments obtained under the Act. More to the point, the trial court's analysis is wrong. To be sure, litigants asking a court to decide their rights in property may do so through a panoply of different causes of action—quiet title, cancellation of instruments, and

declaratory relief, to name a few. (*Yeung*, *supra*, 119 Cal.App.4th at p. 580, fn. 2; *Deutsche Bank*, *supra*, 13 Cal.App.5th at p. 523.) Further, courts continue to apply the common law rule that invalidates any rights in property derived from an earlier judgment later found to be void when that judgment is based on any non-quiet title cause of action (e.g., *Deutsche Bank*, at pp. 516, 521-523 [cancellation of instruments]; *OC Interior*, *supra*, 7 Cal.App.5th at pp. 1322, 1331-1332, 1335 [same]; *Wutzke v. Bill Reid Painting Service, Inc.* (1984) 151 Cal.App.3d 36, 44-45) [same]), while still applying section 764.060 that validates some rights in property derived from a quiet title judgment that complies with the Act (cf. *Tsasu*, *supra*, 62 Cal.App.5th 704).[14] But this dichotomy does not erect "incompatible [or] irreconcilable standards." The Act's purpose was to replace the common law version of a quiet title action—which was not in rem and hence typically only valid against the parties to that action (*Perkins v. Wakeham* (1890) 86 Cal. 580, 583 ["a decree quieting title is not in rem"]; *Park v. Powers* (1935) 2 Cal.2d 590, 598 ["not strictly in rem"]; *Harbour Vista*, *supra*, 201 Cal. App.4th at pp. 1505-1506; *Deutsche Bank*, at p. 526)—with an in rem quiet title

_____

14    We have come across two decisions that involve quiet title judgments entered after 1980, but which still apply the common law rule. (*WFG National Title Ins. Co. v. Wells Fargo Bank, N.A.* (2020) 51 Cal.App.5th 881, 885-886, 889-890; *Lin v. Coronado* (2014) 232 Cal.App.4th 696, 702.) However, these decisions do not discuss the Act at all, and hence do not stand for the proposition that the Act is inapplicable. (*Riverside County Sheriff's Dept. v. Stiglitz* (2014) 60 Cal.4th 624, 641.) To the extent these cases are read for the proposition that it is appropriate to disregard the Act's plain language, we respectfully disagree with that reading.

23

action that was """"good against all the world"""" and hence had more resilience when later attacked. (*Tsasu*, at p. 715; Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1676 (1979-1980 Reg. Sess.) Jan. 16, 1980, pp. 1-2; Cal. Law Revision Com., Analysis of Assem. Bill 1676 (1979-1980 Reg. Sess.) Feb. 21, 1980, p. 1; Recommendation Relating to Quiet Title Actions (Sept. 1979) 15 Cal. Law Revision Com. Rep. (1980) pp. 1207-1208.) The Act is careful to accord its greater resilience only to those quiet title judgments obtained under the Act's more stringent procedures. Thus, a trial court may logically apply the Act's rule regarding the effect of void judgments only to Act-compliant quiet title judgments, while still applying the common law rule to all other judgments. The two standards are neither incompatible nor irreconcilable, and are not readily subject to manipulation because a party that wishes to avail itself of the Act's greater protections for quiet title judgments must take all the extra steps to obtain a quiet title judgment under the Act.

Third, the trial court suggested that it was justified in ignoring section 764.060 because that section is unconstitutional. Unlike a trial court's preference for a different rule as a matter of public policy, a trial court's conclusion that a statute is unconstitutional *can* justify ignoring a statute. (*People v. Willis* (2002) 28 Cal.4th 22, 33; see generally *Marbury v. Madison* (1803) 5 U.S. 137.) But section 764.060 is not unconstitutional. The trial court alluded to two possible constitutional defects with section 764.060—namely, that (1) due process mandates that a judgment obtained without notice to the property owner is void and has no effect; and (2) having different rules for whether rights in property made in reliance on a judgment that is later vacated as void, depending on whether that judgment is a quiet

24

title judgment, is irrational and thereby violates substantive due process and denies equal protection of the law.

The first "defect" does not render section 764.060 unconstitutional. To be sure, due process guarantees notice and the opportunity to be heard. (*Today's Fresh Start, Inc. v. Los Angeles County Off. of Education* (2013) 57 Cal.4th 197, 211-212.) Thus, a judgment against a party who was not properly served violates that party's procedural due process rights and the appropriate remedy is to set aside that judgment as void (*Kremerman, supra*, 71 Cal.App.5th at p. 370; *OC Interior, supra*, 7 Cal.App.5th at pp. 1330-1331). Ocy obtained that remedy—and redressed the constitutional wrong inflicted upon his mother's estate—when the trial court set aside the quiet title judgment as void. What is at issue now, however, is the separate question of what effect to give to the invalidation of the void quiet title judgment as between two claimants who have competing rights in the property and who were not involved in the fraud that ultimately invalidated the judgment. Ocy has actively participated in the litigation of this latter question, so there is no procedural due process violation here; the trial court erred to the extent it imported the earlier due process violation from the prior quiet title proceeding into this separate, subsequent proceeding.

The second "defect" also does not render section 764.060 unconstitutional. Whether our Legislature's decision to enact section 764.060 and thereby create an exception to the common law rule that invalidates all rights based on later-voided judgments violates due process or equal protection turns on largely the same question: Does the creation of this special exception "rationally further[] legitimate ends"? (*Kavanau v. Santa Monica Rent Control Bd.* (1997) 16 Cal.4th 761, 770-771

25

[due process standard]; *People v. Turnage* (2012) 55 Cal.4th 62, 74-75 [rational basis equal protection standard].) As we have discussed above, it most certainly did. The common law rule invaliding the rights of an encumbrancer who relied on a judgment later invalidated as void, even if the encumbrancer acted in good faith and without knowledge of the possible voidness, rested on the courts' balancing of the equities as between the original owner and the encumbrancer. (*Wright & Co. v. Levy* (1859) 12 Cal. 257, 263-264 [looking to the "relative equities" in assessing how to resolve competing claims when one claimant innocently relied upon a later-voided deed]; *Caira v. Offner* (2005) 126 Cal.App.4th 12, 25 [pre-Act quiet title claims "are generally equitable in nature"]; *Mix v. Sodd* (1981) 126 Cal.App.3d 386, 390 [same]; *Gavina v. Smith* (1944) 25 Cal.2d 501, 505 [same]; *Thomson v. Thomson* (1936) 7 Cal.2d 671, 679 [same]; *Gonzalez v. Hirose* (1948) 33 Cal.2d 213, 217 [same].) Section 764.060 strikes a different balance of the equities that favors the encumbrancer, at least as to quiet title judgments that comply with the Act's more stringent requirements and when the encumbrancer acts without knowledge of any defects in the judgment. Because this reassessment of the balance rationally furthers our Legislature's goal of increasing the marketability of title, it is sufficiently rational to withstand constitutional scrutiny.

Because none of the trial court's reasons for disregarding section 764.060 and *Tsasu* are valid, the court erred in refusing to apply the governing statute and binding precedent interpreting that statute.

26

**B.** *Finding that Ridec had actual and constructive knowledge of defects with the quiet title judgment*

As explained above, the record in this case compels a finding as a matter of law that Ridec lacked actual as well as constructive knowledge of any defect with the quiet title judgment and the underlying proceedings that produced it. We now explain why the trial court's findings to the contrary are unsupported either by the law or by the record. In so doing, we focus on the "small[er] part" of reasons the court actually articulated rather than the "great deal" of additional nascent reasons to which the court alluded but opted not to articulate.

The court found that Ridec had actual knowledge of defects with the quiet title judgment because Ocy told "picture takers" he found on the Buckingham property in early 2016 that "'it's all [a] fraud.'" Yet there is nothing in the record to support the trial court's implicit finding that those photographers were associated with Ridec. Indeed, Ridec's owner testified that the company does not ordinarily send any appraisers to the property serving as collateral for the loan. Given the absence of any evidence of association and the undisputed fact that Daire was seeking multiple loans at that time, the association the trial court inferred was speculative. Although we must draw all reasonable inferences in favor of the trial court's ruling (*Tribeca Companies LLC v. First American Title Ins. Co.* (2015) 239 Cal.App.4th 1088, 1102), that deference does not extend to giving effect to speculation.

Combining the reasons the trial court articulated regarding constructive knowledge as well as the reasons the court articulated for why the "judgment roll" in the quiet title action imparted knowledge, the court seemed to find that Ridec had

27

constructive knowledge of defects in the quiet title judgment because (1) the April 2016 notice of withdrawal was inherently suspicious, yet Ridec did not call the persons listed in the notice to verify its legitimacy; (2) Ridec knew about the 2011 conservatorship over Ocie, yet did not investigate it further; (3) Ridec did not physically inspect the property; and (4) Ridec did not independently investigate whether the proof of service showing personal service on Ocie was valid.

None of these charge Ridec with constructive knowledge. Applying the definition adopted in *Tsasu*, Ridec is charged with constructive knowledge of a fact if it had (1) ""knowledge of circumstances which, upon reasonable inquiry, would lead to that particular fact""; or (2) the fact is contained in a properly recorded document. (*Tsasu*, *supra*, 62 Cal.App.5th at p. 719.) A party is not otherwise obligated to "'go behind'" the judgment and independently verify its validity. (*Id.* at p. 723; *Elliott v. Wohlfrom* (1880) 55 Cal. 384, 388 [subsequent encumbrancer is "chargeable with what the record [in the chain of title] discloses, and with nothing beyond what it discloses, unless it be shown that he had actual notice of something outside [the record]"].) The April 2016 notice of withdrawal is not a circumstance that called for additional investigation, as such notices are the statutory mechanism by which a lis pendens is removed (Code Civ. Proc., § 405.50 [procedure for notice of withdrawals]; see also *Garcia v. Pinhero* (1937) 22 Cal.App.2d 194, 196; *Federal Deposit Ins. Corp. v. Charlton* (1993) 17 Cal.App.4th 1066, 1069-1070) and is in no way suspicious. Nor is the notice of the 2011 conservatorship proceeding, which resulted in an order invalidating various transfers to Goddard and predated the quiet title judgment by several years. Ridec was not obligated to

28

physically inspect the property, and Civil Code section 2079.5 cited by the trial court deals with "buyer[s] or prospective buyer[s]"—not *lenders*—and obligates them only to "exercise reasonable care," and does not obligate them to conduct an in-person visitation.  (Civ. Code, § 2079.5.)  Lastly, Ridec was not required to investigate the validity of the proof of service in the quiet title action; the quiet title judgment recited the court's finding that service was proper, and the law does not require a subsequent lender to second-guess such a finding.

*　　*　　*

In light of our disposition, we have no occasion to reach Ridec's alternative argument that Ocy's claim is barred by laches or that the trial court did not comply with the statutes and rules governing statements of decision.

## DISPOSITION

The judgment is reversed and remanded with directions to enter a judgment finding that Ridec's deed of trust is valid. Ridec's appeal from the posttrial order denying its motion to set aside the judgment is therefore moot. Ridec is entitled to its costs on appeal.

**<u>CERTIFIED FOR PUBLICATION</u>**.


_____, J.
HOFFSTADT


We concur:


_____, P. J.
 LUI


_____, J.
 CHAVEZ